Shire v. Amneal Pharmaceuticals Mr. Reed, please proceed. You're intending to use only 8 minutes and reserve 3 for rebuttal, correct? That's right. Your clock says 11, so just be aware that it's not set for 8, so if you go over 8, you're in your rebuttal. Thank you for the reminder. May it please the Court, good morning. Matthew Reed on behalf of all appellants, defendants below. We're here today because the District Court improperly granted plaintiff's motion for summary judgment of no invalidity, despite numerous genuine issues of material fact. In its decision below, the District Court committed significant errors, including two that I'll highlight. First, it failed to consider two key prior art references that are at the heart of defendant's invalidity case. And second, it failed to consider the evidence defendants submitted in the form of expert testimony. Absent these errors, summary judgment never would have been entered. Because of these errors, this Court should weigh evidence and decide factual issues. Of course, on summary judgment, the District Court must view the evidence in the light most favorable to the non-moving party. And here, the District Court did not. The District Court's opinion contains many examples of the errors it committed. First and foremost, it did not consider the Miller patent and the Abramage article. Let me be clear about something. You say he didn't consider expert testimony. I thought not only he considered it, but I thought the opinion at least mentioned that he concluded it wasn't sufficient. So are you saying he didn't consider it, or he didn't do right by it? He didn't properly analyze it the way you'd like him to, because there's a difference, obviously. Not considering it makes it seem like he was oblivious to it, and I thought his opinion actually expressly referenced it. Am I misremembering? In fact, he did both. And there are numerous instances of both. So he referenced something, but nonetheless you think it's fair to represent he didn't consider it? Exactly. There are different issues, and on certain issues, he failed to consider it entirely. He failed to consider it, or he failed to mention those issues? Well he failed to certainly expressly reference it. And in so doing, failed to account for in the opinion that he wrote. In granting summary judgment of no invalidity, when defendants submitted expert testimony on a particular issue, and it was not even mentioned in his opinion, that certainly suggests that there was sufficient evidence on which a trier of fact could have found in defendant's favor. And so summary judgment was not appropriate. So I just want you to be a little more precise. What it just sounded like you said to me was the district court's failure to mention something pretty much automatically means there was enough evidence that summary judgment should have been granted. I really feel like that's not the legal standard that we ever apply. Well, in fact, what the district court did at page 32 of the opinion, is he said that the defendants did not, quote, provide any reason why the skilled artisan would have selected lysine, close quote, where there is a conjugation between L-lysine and D-amphetamine. The district court said that the defendants did not provide any reason why a skilled artisan would choose lysine, when in fact, we did. We submitted both prior art references, the two references that the district court did not mention, Miller and Abramich, and we submitted significant expert testimony describing why those particular references particularly teach the use of lysine. If I can explain in a little more detail, this conjugation between L-lysine and D-amphetamine results from an amino acid and the D-amphetamine, and that is taught explicitly in the 168 reference that the court did consider and the district court did discuss in its opinion, but the Miller patent, which the court neither mentioned nor described. There was a footnote in which the district court referred in passing to two references. I think that if you trace the reference there that what the district court is referring to is the use of Miller and Stein, two references regarding progress. They didn't even reference Miller anywhere, but now you're telling me, well, he did reference Miller in a footnote, correct? He referenced Miller in a footnote, but he did not reference it in the context of L-lysine, when he explicitly said that defendants didn't give a reason why L-lysine would be selected. In fact, L-lysine was one of the listed amino acids both in the 168 reference and in the Bromwich reference explicitly talks about the use of lysine, and in fact teaches that it is one of the best amino acids to use in this kind of conjugation when what you want to do is you want to find enzymatic cleavage in the body between the amino acid and the underlying compound where it's an aromatic ring, and that amide bond in between those two constituents is targeted specifically by lysine. One of ordinary skill in the art would recognize that the teachings of these three references in combination, the 168, Miller, and Bromwich, are sufficient on which a trier of fact could decide that lysine is a preferred amino acid for the conjugation reaction. Even if you're right about what you're saying, wouldn't there have been an incredibly large number of salts that could be made? Just the examples given are, what, 1,496 possible salts, and formula four discloses 1,496 possible salts. I mean, I feel like even if you are correct that that was a problem in the district court opinion, you then also have to get over the other hurdle of whether or not there are such an absurd number of possibilities to try that this one would have been the obvious one to select out. Certainly there are these two pieces of the puzzle here. There's the conjugation between L-lysine and D-amphetamine, and then there's the second piece of creating the dimesylate salt, and at page 31 of the district court's opinion, the district court asks, why would a skilled artisan be motivated to modify lisdexamphetamine, the conjugation, to make the dimesylate salt? Defendants submitted evidence from an expert with decades of experience in salt selection and salt preparation, Dr. Atwood. Dr. Atwood offered testimony about the 168 reference, and the Miller reference, and Bairge and Biley references, describing how one of ordinary skilled in the art would read those references. And in particular, he testified that one reading the 168 reference would recognize the use of P-toluene sulfonic acid to create a salt. It's explicitly taught in the 168 reference. In the Miller reference, it's explicitly taught to use methane sulfonic acid. So it would be a simple substitution of using methane sulfonic acid to create the dimesylate salt. There's no question, but that methane sulfonic acid results in the dimesylate salt here. By the way, plaintiff's counsel agreed that the purpose in formulating the salt is for use in a pharmaceutical composition. At the oral argument before the district court on summary judgment, counsel for plaintiffs was questioned repeatedly about the purpose. And the intended purpose, as he admitted, was for use in a pharmaceutical composition. The 168 reference teaches the preparation of salts conjugated by way of acid addition salts. And certainly, the defendant submitted evidence about one of ordinary skill in the art, the level of skill in the art, and that was never determined by the district court. The district court should have recognized the first gram factor consists of evaluating the level of skill in the art, but he failed to make that determination. Unless the court has additional specific questions at this point, I'll reserve the remainder of my time for rebuttal. Okay. Thank you, Mr. Reed. Mr. Trella? Thank you, Your Honors. May it please the court, Johnson Matthey joins in the invalidity argument. Why isn't Forrest finding on us? Whether I wanted to go a different route or not, why do I even have that option after Forrest? I think you have that option because Forrest doesn't address the question presented here. Forrest was a narrow decision. It did not involve any liability questions. There was a stipulation of liability in that case. No, actually, there wasn't. There was a stipulation. Did you pull the stipulation? I did pull the stipulation. I have it here in front of me as well. Yes. Because I didn't understand how you argued that CIPLA had stipulated to infringement based on the language in Judge Lori Forrest's opinion, so I thought, well, maybe you know something I don't. Stipulation doesn't work. There were two stipulations. Did you look at both stipulations? I thought both. Well, one of them said that CIPLA and IBEX stipulated that they are jointly liable for infringement. No. No, no, no, no. False. They said they would be jointly liable for any such infringement. Right. Would be. And the predicate sentence before that is if the product is sold commercially in the United States following approval, they would be liable. CIPLA never stipulated to any current liability of any kind. Correct, Your Honor, and that's really the point, and if the brief was misleading on that, I apologize. It was certainly not our intent. The court in Forrest did not decide any infringement issues. In fact, the court made a point of saying, and this is at page 1266 of the opinion, that the district court had, because of the stipulation, the district court had only had to decide the validity issues presented by the counterclaims. So there were no liability issues before the court, but the issue in Forrest was whether the injunction entered pursuant to that stipulation could properly include CIPLA as well as IBEX. But wasn't the subject matter jurisdiction question with regard to CIPLA before the district court? Subject matter jurisdiction? In other words, the same issue that we're discussing here was presented in the district court in the Forrest case, was it not? I don't believe so, Your Honor. I don't believe that CIPLA argued that it was not liable, could not be liable for infringement because of the safe harbor, which is, of course, Johnson Matthey's argument here. Well, it was an order issued by the district court in March of 2005 based on a motion, CIPLA's motion to dismiss for lack of subject matter jurisdiction. CIPLA contends the court lacks jurisdiction because the Hatch-Waxman Act does not confer subject matter jurisdiction over the aiding and abetting of an ANDA file. Right. And I believe that CIPLA's argument was the action was for infringement under 271E2, which is if you file an ANDA, you can be charged with infringement. And I believe CIPLA's argument was that it could not be held liable for that kind of I don't believe that that technically is really a subject matter jurisdiction argument. That really goes to whether you committed the act of infringement. But the dissent expressly says that CIPLA argued E1 goes through it, and the majority addresses whether or not CIPLA qualifies under E1 and whether that would exempt them from being able to be found liable or the scope of the injunction. So I don't understand how you can argue that that is a distinction between that case and this case. Here's the distinction, Your Honor. In Forrest, the question was the scope of the injunction. What the court did have to say about infringement is it said that nothing up to that point was infringement. That's including supplying the API and information concerning it for use in the ANDA. That's the point we're at here. We're only up to that point here. What the court with the injunction in Forrest had to do with the potential for future infringement. And I would submit that to the extent that you read Forrest to say that there can be present inducement liability for something that may happen in the future, it didn't survive Limelight. Because Limelight is very clear that to have inducement liability today, you have to have some underlying direct infringement today. But, no, Limelight didn't change the law, Mr. Trolla. I don't even like that you're making this argument. Because Limelight didn't change the law when it comes to the requirement of direct infringement. That's been established since ARO. All Judge Bryson said in Limelight from our court was that there's a difference between direct infringement on the one hand and liability for direct infringement of the other. And Limelight clarified, uh-uh, no, there isn't. So I don't see how that could have affected what Judge Lurie was doing in Forrest. Well, what I'm suggesting to you is, I don't think Judge Lurie was deciding that there was inducement liability on the part of the API supplier in Forrest. CIPLA has therefore actively induced the acts of IVACs that will constitute direct infringement upon approval of the ANDA. Your Honor, the key word is the act that will constitute direct infringement. But he doesn't say CIPLA will actively induce. He says CIPLA has, therefore, actively induced. But you can't actively induce something that hasn't happened. That's what Limelight holds. And I understand that that was the law before then. And maybe it wasn't argued that way in Forrest. But if you read Forrest that way, it did not survive Limelight. I don't understand, though, what your decision is premised on. I mean, you're nuancing the statutes. And I don't know that I would conclude you're wrong in your statutory interpretation analysis for the existence of Forrest, which I feel quite bound by. But what I don't understand is the scenario you're presenting happens all the time in DJ jurisdiction. Someone is imminently going to cause a harm to someone else. And you can seek and obtain an injunction to prevent that imminent harm. Upon approval, JM admits it's perfectly happy and willing to supply the drugs that would then harm the patentee. So why don't we – don't worry about your time. Why don't we have a similar scenario here? What is – why doesn't this fall right into that well-established and accepted pattern? If we had an imminent risk of harm, subject – obviously, as your Honor knows, for DJ action, you have to have immediacy and reality, the metamune factors. There was no showing of that here. There was no claim of that here. The district court, in fact, found that the ultimate potential infringement was remote and contingent on FDA approval and the generic decision to enter the marketplace. Did he actually say remote? He did use the word remote. He said two remote events, FDA approval and the generic entry into the marketplace. I think it's Appendix 16. So you're saying there's not sufficient immediacy to justify enjoining a supplier that would – that does stand ready and willing to induce infringement, even if they haven't done it yet because it's not sufficiently immediate, and that's why we should break stride with the notion that DJ judgment does allow for these sorts of injunctions. In this context, I believe that's right, your Honor. And when you think about it, it makes sense because the whole reason that Congress created the 271E2 technical act of infringement was because it needed to create some sort of a present dispute, a case or controversy that federal courts could adjudicate because merely the filing of the ANDA – It wanted to move it up. It wanted to move it up, right, because before that point, without the statute, there would not be immediacy and reality. You wouldn't have the imminence that you need for DJ jurisdiction or for a preliminary injunction. And so what E2 does, it creates that cause of action. It creates the current dispute that a federal court has to have to decide a case. And the other thing I would point you to, your Honor, is E4, which specifies the remedies for an E2 act of infringement. The court in Glaxo said these are the only remedies for E2 infringement, and the statute itself actually says the same thing. And there's no suggestion in there that, other than in that context, that you can get a preliminary injunction against anybody other than the ANDA filer itself. It talks about the infringer, defines the act of – No, it says infringers. And certainly, for example, if your client was in charge of inducement, i.e. encouraging someone to file an ANDA, which was an act of infringement, then wouldn't you agree that if that were the facts, which are not necessarily these facts as argued, that that would allow for – I mean, E4 says infringers. And couldn't someone be an induced infringer if they're encouraging the filing of an ANDA? I don't think so for a couple of reasons. One is I don't think – I think when it says an act of infringement under E2 and it talks about infringers, I think it's talking about the person who infringed under E2, not 271B. And the other point, Your Honor, is if you've induced the filing of an ANDA, it's within the safe harbor because it's virtually, by definition, reasonably related to the development and submission of the ANDA. You can't induce the filing of an ANDA by doing something that's not reasonably related to the submission of an ANDA. And that circles back to the whole reason that we shouldn't be here. And the reason, I think, that Forrest, if you carefully read, I think confirms that because, as I mentioned, Judge Lurie and Forrest said there has been no infringement up to this point. And that is the point we're at. The supply of the people – And then he went on to hold the supplier nonetheless subject to an injunction. What's the harm to your client? Why are we here? Well, the harm to our client – Because there can't be any monetary damages. And I went back and looked and the district court struck out by pencil, it looks like, the portions of the injunction that would otherwise apply to your client. So I'm not sure what really even is at issue here. Well, there are a couple of things at issue, Your Honor. One is, there is a judgment against us for inducement of – it says we have induced infringement. The only direct infringement that could have occurred thus far as the filing of the ANDA, that's the safe harbor. We should not be subject to an inducement judgment for safe harbor activity. The other thing, Your Honor, is there's a policy question here. The whole purpose of – So would you be happy if we said your client has not yet induced infringement, however under Forrest, that doesn't mean a court isn't capable of subjecting them to an injunction forward-looking? I wouldn't be thrilled with that. It's better than what we've got, certainly. I think the correct answer, Your Honor, is to reverse the judgment of inducement because for multiple reasons we cannot be liable for inducing infringement today. And then in the future, if the ANDAs are approved and Johnson Matthey is supplying the API for that, the normal infringement process applies. All the regular remedies apply. And going back to your remoteness point, if we didn't have what seems like a determination of remoteness, how far away from the approval process are we? I don't know the answer to that, Your Honor, because we're not an ANDA filer and we haven't even seen the ANDAs. Yes, but if you could arguably be held subject to an injunction if there was an immediacy notion to your threatened infringement, then it would certainly be relevant how far along in the process the approval was, right? I do agree with that, Your Honor. Obviously, the question of immediacy and imminent harm and all of that, it depends on how far away you are from the actual real infringement taking place. I don't know the answer to that because, as I said, we're not the ANDA filer. We haven't even been allowed to see the ANDA filings, so we don't know where that process stands. Thank you. All right. Mr. Chen, we went over with Mr. Trella, so especially on the JM side of this, if you need extra time, you can have some. Good morning, Your Honors. May it please the Court. My name is Angus Chen of the law firm Frommer Lawrence & Haug on behalf of Appellee Patentee Shire. Your Honor, first off, we agree that the District Court did consider all the references and the expert opinions as evidence in footnote 7 of the opinion as well as the District Court's order expressly stating that he considered all of the arguments. There was lengthy submissions before the District Court as well as an oral argument. In sum, there are no disputed facts where there's a failure of proof, and there are no inferences to be drawn where there's absent facts to avoid summary judgment as the case is here. There is a full record that the District Court considered. I thought about Mr. Reed's argument that the District Court didn't consider two references and all these experts. Right. So one of the references, as the Court recognized, was considered in footnote 7, and as I said, the District Court's order said that he considered all the references, and I don't believe there's any requirement that the District Court expressly address in its opinion each of the references as long as they were considered. Defendant's argument is hindsight reconstruction, and that's true for all the 17 compound claims that are directed to the compound itself as well as physical characteristics and also the one method of treatment claim. We know that because they define the problem in terms of its solution, the claim compound. Now defendants did not appeal the District Court's finding of no invalidity based on anticipation, so there's no dispute that the lisdexamphetamine dimuselase is not disclosed in the prior article. So the reality is, for obviousness, a person of ordinary skill at the time of the invention would have had to have asked six questions. But defendants haven't offered any evidence of a motivation for why a POSA would have even wanted to ask those six questions, let alone answer them. So for example, question number one, why pick up deamphetamine in the first place? Because in spite of whatever side effects it may have, defendants repeatedly say in their briefs that it has long been known as safe and effective. So what's the problem with deamphetamine? They don't answer that question. Question number two, why chemically modify deamphetamine? What's the problem with changing its formulation? Again, no answer. Question number three, why make a prodrug of deamphetamine? What's the problem with making a new derivative or derivative compound? Again, they don't answer that question. Question number four, why pick L-lysine? What's the problem with other amino acids, other amino acid derivatives, other modified amino acids? They don't answer that question either. Question number five, if you even had Lysdexamphetamine, why even make a salt of it? What is the problem with the free base compound? Again, they don't point to any prior art or data or evidence to suggest that problem or motivation. Finally, question number six, why make a mesylate salt specifically? In other words, what are the problems with the other salts? What's the problem with a hydrochloride salt, with a phosphate salt, with a sulfate salt, and all the other types of salts that are the numerous possibilities that Your Honor pointed out? It's important to identify the motivation because, as we all recognize, motivation is the safeguard against hindsight bias, and they failed on all fronts here. This case is just like the Ortho McNeil case, where this court affirmed summary judgment of non-obviousness of a compound patent from the same district court judge, Judge Shessler. Why is that? Because the references in Ortho McNeil dealt with compounds that had properties far afield from each other. That's exactly the case here. The compounds have properties far afield from each other in the references and from the claimed compound. AU, defendants admit in their reply brief at page 13, doesn't even teach pro-drugs. If you don't mind, could I get you to move over to the JM argument? Sure. Yes, Your Honor. Can you tell me your thoughts on that? With respect to JM, we agree that Forrest is binding. Star is decisive, strongly applies, especially in non-constitutional situations. And it's actually a straightforward reading of this court's precedent in Allergan as well as Glaxo, which was also a compound patent. Well, what about what I proposed to Mr. Trella? I don't see a holding of liability against Cifla and Forrest, rather just a prospective injunction. Why isn't that what ought to be permissible in this case? Well, we believe... The district court in this case held JM liable for induced infringement. Right. But they haven't actually yet induced infringement, correct? Well, the essence of hash-waxman is based on future acts of infringement. That's the sort of quirkiness of the statute, right? So Section 271E creates a case of controversy that imparts jurisdiction under 1338A. And then the traditional patent infringement analysis is conducted under 271A, B, or C, right? And that's been held since Glaxo and Allergan. Yes, but E1 only allows for liability against an and a filer. So what Congress sought to do was move up the date. I mean, we don't generally like the idea of Congress messing with cases or controversies and what typically would amount to a case or controversy, right? But in this case, they sought to do it, but as to a very precise and specific group of people, and filers, as the statute says. So they really... What they did is they sort of moved up the date. And I understand the rationale for why, because, goodness, if you don't move up the date and you have to wait to sue them until they actually sell, then the brand is going to lose so much. And so I understand why they moved up the date as to the and a filers. But the language is quite precise, and it's the and a filers. I would submit that under the Glaxo case from 1997, Glaxo v. Nova Farm, it clearly stated that infringement in the Hash-Waxman case is not established by the filing of the and a. It's based on the product to be sold or likely to be sold. And if you focus on that future product likely to be sold, there certainly can be liability for induced infringement in the Hash-Waxman context. Your Honor is very correct that there is no arm to Johnson Matthey or any API supplier. Well, let's just be clear, absent 271E, you couldn't have brought this case against the and a filers, correct? Well, I don't think this is, yes, against the and a filers, but actually I don't think this situation is any different than Johnson Matthey, just a few months ago while this briefing was going on, filed a declaratory judgment against Pfizer. Seeking a judgment of no infringement, no liability based on an and a that hasn't been approved yet. So in my mind, that's the same thing here. Johnson Matthey can't hide or an API supplier can't hide behind the safe harbor when it infringes. And then when it thinks it doesn't infringe, file a DJ. And so they're fully aware of that. And as you see what that has to do at all with how I construe 271E, the actions that they may or may not have taken in some other case, not before me, not part of this record, not something I'm subject to decide. So tell me why, what part of 271E gives you the basis to sue them? Well, as I said, under Glaxo, because the infringement analysis established by the product likely to be sold, the future product, that's what the basis for infringement. And so because under Glaxo... That's not the basis. That doesn't create a basis for infringement. There is no 271Z that says future product creates. The basis is still, even under Glaxo, the basis is 271E liability. And Congress may have explained that the reason they're doing that is preventing future sales, but Congress chose to limit it. And Glaxo doesn't say, and therefore you can go after anybody that helps them in this process. Right? Glaxo just explains the rationale for why E can be applied and result in liability for the actual filer. Yeah. So I would submit my response to that is if you look at the Allergan case, it says the 271E-2 is not a jurisdictional statute in the strictest sense. And so that was the basis. It's not a jurisdictional statute, it's a liability statute. It establishes the standard under which liability can be asserted. I'm sorry. And the liability is then established under 271A, B or C. So what says that? Allergan doesn't say that. I've got it right here. You show me where in Allergan it says that the liability that you're actually suing on is under A, B or C. I think that's under Glaxo, where it says after jurisdiction is conferred, the case or controversy is established under E-2, the traditional infringement analysis is conducted under 271A, B or C. Which one came first, Glaxo or Allergan? Glaxo. OK. So Glaxo came first and you're saying it treats E as jurisdictional, but then a jurisdictional, right? Kind of, isn't that what you just said? I'm saying that E-2 opens the door to create jurisdiction under 1338A and then infringement is established under A, B or C. With respect to your question about harm and immediacy, actually in this case there are already three ANDAs already tentatively approved. And so in my mind there would be some immediacy with respect to harm. Lastly, I'd like to just say the Safe Harbor argument is a red herring in our mind. Three of the ANDAs that are subject to this lawsuit are already approved? Tentatively. And are those three, I don't remember from the record, is every one of the ANDA filers going to use JM as a source supplier? Yes, Your Honor. And my last... You're going to have to address that when you get back up. My last point is the Safe Harbor argument is irrelevant. It's sort of a red herring because of Hatch-Waxman looking at future acts. So regardless of whether the Safe Harbor protects an API supplier, you're looking at the future liability, the future acts of infringement. That's it, Your Honor. Thank you. Unless the Court has further questions. Mr. Reed, some rebuttal time left. Thank you, Your Honor. Picking up where I left off, regarding the level of ordinary skill in the art, the first consideration, and one that is an issue of fact, in this case, Judge Chesler did not determine the level of ordinary skill in the art. That compounds the errors that he then made from the rest of his opinion. Was there a dispute among the parties about what the level of skill in the art was? Absolutely. A very heated dispute. And that underscores how there was evidence on both sides. The defendant's experts offered opinions that the level of skill in the art include a high level of education and skill, a certain number of years of experience, whereas the plaintiff's experts opined that the level of skill would be relatively low. That dispute was never resolved. It's a dispute of fact. Well, we can't resolve disputes of fact on summary judgment, so I just have to assume he found or that that fact would be favorable to you. Does it change the outcome? I think it does. Because one with a high level of skill, somebody with the years of experience that our experts opined would be necessary to have that level of skill. Why would they choose the one salt that is the patented salt out of thousands of possible options? The testimony that Dr. Atwood submitted lists the reasons why. And he described, first of all, that the making of salts is very common, well understood, and has been done for years. There's a making of salts, but there's lots of different ones. It doesn't say why this one. But he explained that the 168 reference teaches the use of P-toluene sulfonic acid to make a salt and that immediately coming to his mind and to the mind of one of skill in the art would be a simple substitution to use methane sulfonic acid. From there, the Miller reference explicitly teaches the use of methane sulfonic acid. It's one of only 10 acids listed in the Miller reference. From there, the Berge and the Biley references highlight the very routine nature of using salts and both of them list the meslate salt as among the top 10 most commonly used salts. And finally, and this is significant, plaintiffs are not appointed. I have that Miller discloses 200 possible salts, 20 amino acid choices and 10 different acid choices. That would be 10 times 20. That would be 200, as best as I can tell. So that would be the two pieces, right? There's the first piece of conjugating L-lysine with D-amphetamine and then the second piece  And D-amphetamine isn't even disclosed in Miller. Miller has metaraminol, which is within the scope of the... But D-amphetamine is not disclosed and then you've got 200 possible salts, right? So D-amphetamine falls within the claim construction of the district court. Metaraminol, excuse me, metaraminol falls within the definition of amphetamine as construed by the district court. And among the amino acids, Miller's disclosure includes about 20. That 168 reference includes about 20. Well, Miller discloses 20 and then 10 acid choices. Right. So then the 10 acid choices is kind of the second piece here. Among those 10 acid choices, methanesulfonic acid is explicitly listed. So we have the understanding of a person of ordinary skill in the art looking at these that it would be obvious to combine L-lysine, to choose L-lysine. And the plaintiff's... But you've got to make selections from all of these different pieces to put this together. The question is what would motivate anybody and what evidence is in this record would motivate anybody to make these specific selections out of all of these variables? The rationale here, as articulated by our experts, is that combining known elements using known methods to achieve predictable results. Well, that's fine if you've got a handful, but when you've got hundreds, that's a different story. The testimony of the experts disclosed that one of ordinary skill in the art would immediately hone in on only particular components to combine. And so when you've got the level of ordinary skill in the art undefined, when you've got the selection of L-lysine explicitly addressed by a reference, a Bromwich reference that the district court never considered, never acknowledged, and then you've got the selection of the mesylate salt, which the plaintiffs have never claimed have any particular properties. There's no specific reason on this record to choose the mesylate salt over any other salt. In that respect, it's slightly different than the Pfizer-Viapatex case. Thank you, Mr. Reed. Thank you, Your Honor. Mr. Trelley, you have one minute. I will try to talk fast, so I'll start before I get up there. Two quick points, Your Honor, first, and I will get to the ANDA point. The argument about Glaxo and Allergan and future infringement is just wrong. The analysis in an ANDA case is, is the act of filing today an act of infringement, and the way you analyze that is by looking to what will happen in the future, but the infringing act has occurred today. It's not a determination of future liability. But you do agree courts can issue injunctions even absent present infringement if it is otherwise. If it's imminent and irreparable harm and all of that, of course. And so that gets to your question, Your Honor. Obviously, there's a different state of facts now than there was when the district court decided this. I think the proper disposition is to reverse the judgment that Johnson Mathey has induced infringement because it hasn't. But we don't know what the date is that the approval occurred, right? The date after the district court opinion. I don't have this information in the record, and also it hasn't been that long. So it seems like probably the immediacy component was met at the time he decided it. Well, no, I don't think so, Your Honor. The judge did say that there are future remote events that all of this is contingent on. At the time, all we can do is look at the record as it existed at the time he made his decision. The time he made his decision, it was just wrong to say that Johnson Mathey has induced direct infringement. Because of the safe harbor, it couldn't be the ANDA filing. Nothing else had happened. Now, if the facts have changed, I think the appropriate disposition is reverse that judgment, send it back to him. Well, but we have Forrest that says you can enjoin a supplier, and I had my clerk look it up while we were talking, and the ANDA and Forrest was approved five years after Judge Florey's decision. So certainly he didn't premise his decision on some notion of immediacy, despite the fact that I'm bringing that up. Right. Well, I understand that, Your Honor, but Forrest, we think because of the fact that the infringement liability had been taken out of the case, that all the court was deciding was the scope of the injunction, assuming infringement liability, assuming inducement liability, assuming direct infringement. It's not what we have here. Now, if the approval of the ANDA changes things, that's something for the district court to consider in the first instance. There is a judgment that says Johnson Matthey has induced infringement is just wrong, even if Forrest is correct. And even if Forrest somehow addressed liability, that judgment is wrong because there is no direct infringement that Johnson Matthey could have induced. If the court has no further questions, I appreciate all of the time you gave me. Thank you, Mr. Chalmers. Thank you. Thank you. This case is taken under submission.